UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELISA MUNGUIA,
*on behalf of herself, FLSA Collective Plaintiffs
and the Class,*

        Plaintiff,

        v.

PUP CULTURE LLC
    d/b/a PUPCULTURE,
PUPCULTURE DUMBO LLC
    d/b/a/ PUPCULTURE DUMBO,
PUPCULTURE FIDI LLC
    d/b/a/ PUPCULTURE FIDI,
PUPCULTURE TRIBECA LLC
    d/b/a/ PUPCULTURE TRIBECA,
PUPCULTURE UWS LLC
    d/b/a/ PUPCULTURE WEST 57,
JOHN DOE CORPORATION
    d/b/a PUPCULTURE SOHO,
and IBRAHIM ALIMIMEH,

        Defendants.

Case No : 22-cv-05744

---

## DECLARATION OF ELISA MUNGUIA

I, ELISA MUNGUIA, under penalty of perjury, declare as follows:

1.    In or around May 2021, I was hired by Defendants to work as a Receptionist at the Pupculture Tribeca Facility located at 170 Hudson Street, New York, NY 10013.

2.    On February 18, 2022, I was fired by Defendants when I requested to use vacation time, which I accrued during my employment with Defendants.

3.    During my employment with Defendants, I was transferred to work at Defendants' Pupculture FIDI Facility, located at 21 Murray Street, New York, NY 10007 for a month, until I

was transferred back to work at the Pupculture Tribeca facility. Likewise, Defendants' other employees were also transferred between the below locations on an as needed basis:

    a. 645 West 57th Street, New York, NY 10019 ("Pupculture West 57")

    b. 149 Plymouth Street, Brooklyn, NY 11201 ("Pupculture Dumbo")

    c. 521 Broome Street, New York, NY 10013 ("Pupculture Soho")

    d. 170 Hudson Street, New York, NY 10013 ("Pupculture Tribeca")

    e. 21 Murray Street, New York, NY 10007 ("Pupculture FIDI")

    (Collectively, the "Facilities")

4. From my experience and understanding, the Facilities are operated under the control of Defendants, under the same General Manager, Diana [LNU], and with the same payroll person, Jenny [LNU]. The different locations for Pupculture's Facilities are jointly advertised on Defendants' websites where customers are able to make registration for services, such as dog walking, dog grooming, dog daycare, and boarding for all of the Facilities.

5. Throughout my employment with Defendants, I regularly observed and spoke to my fellow non-managerial co-workers. Such co-workers include, but are not limited to:

| Name | Position | Location(s) |
|---|---|---|
| Rachel [LNU] | Receptionist | **Pupculture Tribeca**: 170 Hudson Street, New York, NY 10013 |
| Laura [LNU] | Kennel Attendant | **Pupculture Tribeca:** 170 Hudson Street, New York, NY 10013 |
| Miguel [LNU] | Dog Walker | **Pupculture Tribeca:** 170 Hudson Street, New York, NY 10013 |
| Carmen [LNU] | Groomer | **Pupculture Tribeca:** 170 Hudson Street, New York, NY 10013 |
| Ashley [LNU] | Receptionist | **Pupculture Tribeca:** 170 Hudson Street, |

|  |  | New York, NY 10013<br><br>**Pupculture FIDI:**<br>21 Murray Street,<br>New York, NY 10007<br><br>**Pupculture Soho:**<br>521 Broome Street,<br>New York, NY 10013 |
|---|---|---|
| Tatianna [LNU] | Kennel Attendant | **Pupculture Tribeca:**<br>170 Hudson Street,<br>New York, NY 10013 |
| Laura [LNU] | Receptionist | **Pupculture Tribeca:**<br>170 Hudson Street,<br>New York, NY 10013 |

Based on my work experience, personal observations, and conversations with co-workers, I know that all employees of Defendants were subject to the same wage and hour policies. I regularly spoke with my co-workers on pay days, which would reoccur every two weeks.

6. For most of my employment with Defendants, my schedule fluctuated. Generally, I had two scheduled shifts: (i) Shift 1: lasted from 12:00 p.m. to 8:00 p.m. and (ii) Shift 2: s lasted from 11:00 a.m. to 7:00 p.m. Every week, Defendants would instruct me to work either Shift 1 or Shift 2 for three (3) or four (4) days out of the week, and my days off would vary by each week. Additionally, for at least once or twice a week, Defendants required me to work double shifts, which lasted from 8:00 a.m. to 8:00 p.m. on weekdays, or 8:00 a.m. to 7:00 p.m. on Sundays. Most of the times, I worked five (5) days per week. However, about twice per month, I was required to work six (6) days in a week.

7. Throughout my employment with Defendants, I was paid at a base rate of $18.00 per hour.

8. Defendants had a clock in and out system, and employees were required to clock in and out whenever their shift began or ended. I know that Defendants failed to compensate me for

all hours worked. I also know that I was not alone with this problem. Rachel [LNU], Laura [LNU], Miguel [LNU], Carmen [LNU], Ashley [LNU], Tatianna [LNU] and Laura [LNU] and I discussed about the fact that there were compensable hours missing from their paystubs. These conversations occurred with particular frequency on pay days when my coworkers and I reviewed our compensation. We would all see that Defendants frequently failed to compensate them us for approximately one (1) to two (2) hours a week. In some cases, an entire day's worth of work would be missing.

9. I recall one conversation occurring on or around Thanksgiving 2021. It was me, Carmen [LNU], Ashely [LNU], and Manuela [LNU] all discussing our checks. We all agreed that you had to "be careful and make sure to double check everything." We were always missing hours. I remember during that conversation that Carmen [LNU] told me Defendants were deducting time from employees compensation as punishments for mistakes. Manuela [LNU] cried when she discussed how she was being treated. She complained that she always had to go to Jenny [LNU], the payroll person for the Facilities, to fix her hours. They were always wrong. I also know that it was not easy to spot how wrong the checks were because Defendant paid bi-weekly. If Defendant miscalculated my hours on the first of the month, I would not see a check until almost the twenty-first. I remember Carmen [LNU] and Manuela [LNU] asking Ashley [LNU] and I if this happened at all the Facilities. We both agreed it did. Ashley [LNU] said that Defendants' payroll was the same across Facilities and people were always underpaid for their hours. She agreed that all the Facilities used time deductions as a punishment.

10. Another conversation around the weekend of July 4, 2021. I, Miguel, and Tattiana all complained about Defendants 'wait-time' punishment. Defendants instituted a policy which prohibited employees from clocking in even if they were even one (1) minute late to work.

Employees who were late would have to sit and wait at least one-half-hour before clocking-in. Consequently, every time I, Miguel, or Tatianna were even one (1) minute late, Defendants required me to wait up to one (1) hour without any compensation.

11. More than my conversations, I could see other employees at both locations where I worked were being forced to sit and wait as a punishment for tardiness or mistakes.

12. I never received proper wage and hour notice from Defendants. Based on my personal observations, other employees (including, but not limited to, individuals listed in ¶ 5 herein) also did not receive necessary wage and hour notices at all relevant times.

13. During my employment with Defendants, I did not receive proper wage statements from Defendants for most of my employment with Defendants. The few wage statements I did receive from Defendants failed to state the correct number of hours that I worked each week, due to Defendants' pay calculations and waiting policy. The wage statements did not reflect the hours I worked after my shift. Based on my personal observations and conversations with my co-workers, other employees (including, but not limited to, individuals listed in ¶ 5 herein) received similar improper wage statements.

14. I agree to act as a class and collective representative, and I am of sound mind and body.

15. I do not have any conflicts with prospective class members.

16. Esta declaración ha sido traducida para mí en español y es verdadera y correcta a mi leal saber y entender.

I affirm, under penalty of perjury, that the above and foregoing information is true and correct.

Date: Nov 4, 2022

*Elisa Munguia (Nov 4, 2022 09:30 EDT)*

**ELISA MUNGUIA**